Jorge Yarur BASCUÑÁN, Tarascona Corp., Hofstra Corp., Inmobiliaria Milano S.A., Inmobiliaria E Inversiones Tauro S.A., and Inversiones T & V S.A., Plaintiffs-Appellants,

v.

Daniel Yarur ELSACA, Cristián Jara Taito, Oscar Bretón Dieguez, GM & E Asset Management S.A., Fintair Finance Corp., Euweland Corp., Hay's Finance Corp., Cary Equity's Corp.,

Agrícola E Inmobiliaria Chauquén Limitada, John Does 1-10, and Alapinjdp Investing Corp., Defendants-Appellees.†

No. 16-3626-cv
August Term 2016

United States Court of Appeals, Second Circuit.

Argued: April 28, 2017
Decided: October 30, 2017

† The Clerk of Court is directed to amend the official caption as set forth above.

ROBIN L. ALPERSTEIN (Jesse T. Conan, on the brief), Becker, Glynn, Muffly, Chassin & Hosinski LLP, New York, NY, for Plaintiffs-Appellants.

JENNIFER M. SELENDY (William B. Adams, on the brief), Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, for Defendants-Appellees.

Before: CABRANES, LIVINGSTON, Circuit Judges, and PAULEY, Judge.*

JOSÉ A. CABRANES, Circuit Judge:

The question presented in this appeal is whether the plaintiffs have plausibly alleged "a domestic injury" to their business or property within the meaning of Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the provision commonly referred to as civil RICO.[1] This question is one of first impression—in this (or any) Court of Appeals—arising from the Supreme Court's decision in *RJR Nabisco, Inc. v. European Community*.[2]

▪ In *RJR Nabisco*, the Supreme Court held, among other things, that Section 1964(c) of the RICO statute, which gives a private right of action to "[a]ny person injured in his business or property by reason of a violation of [RICO's substantive provisions, codified in Section 1962]," does not apply extraterritorially.[3] Accordingly, the Supreme Court explained that "Section 1964(c) requires a civil RICO plaintiff to allege and prove a *domestic* injury to business or property and does not allow recovery for foreign injuries."[4] The Supreme Court did not explain, however, how to determine whether an alleged injury is domestic or foreign.

Plaintiff-appellant Jorge Bascuñán, a citizen and resident of Chile, brought an action under civil RICO in the United States District Court for the Southern District of New York (George B. Daniels, *Judge*) against his cousin, defendant-appellee Daniel Elsaca, also a citizen and resident of Chile. Bascuñán alleged that Elsaca, who had power of attorney over Bascuñán's finances, stole millions of dollars from Bascuñán through several fraudulent financial schemes.

In the District Court, Elsaca moved to dismiss Bascuñán's complaint on the ground that he failed to allege a domestic injury as required by *RJR Nabisco*. The District Court granted the motion and, characterizing Bascuñán's injury broadly as a $64 million "economic loss," held that, because individual plaintiffs suffer economic injuries at their place of residence and because Bascuñán was a resident of Chile, Bascuñán alleged only foreign injuries. Its holding set forth, in sum and substance,

---

* Judge William H. Pauley III, of the United States District Court for the Southern District of New York, sitting by designation.

1. 18 U.S.C. § 1964(c).

2. —— U.S. ——, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016).

3. *Id.* at 2106 (quoting 18 U.S.C. § 1964(c)). Section 1962 of RICO "sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control or operate an enterprise which is engaged in, or the activities which affect, interstate of foreign commerce." *Id.* at 2097 (internal quotation marks omitted).

4. *Id.* at 2111 (emphasis added).

the following rule: a foreign plaintiff who suffered an "economic loss" due to a RICO violation cannot, absent extraordinary circumstances, allege a domestic injury. On appeal, Bascuñán argues that the District Court erred in relying exclusively on his place of residence to determine that he alleged only foreign injuries. He asserts that, because he alleged injuries to property located within the United States, he satisfied civil RICO's domestic injury requirement. We agree.

While Bascuñán claims a total loss of $64 million, he alleged, in part, the misappropriation of specifically identifiable property that was located in the United States when it was stolen. In particular, he alleged the misappropriation of about $3 million held in a bank account in New York, and the theft of bearer shares, worth roughly $40 million, from a safety deposit box also in New York. Because this property was located within the United States when it was stolen, we conclude that Bascuñán has plausibly alleged a domestic injury notwithstanding the fact that he is a citizen and resident of Chile.

To be clear, we do not hold that a plaintiff's place of residence is *never* relevant to the domestic injury inquiry required by *RJR Nabisco*. Nor do we hold that *any* contact with the United States suffices to make an injury domestic. Indeed, with respect to Bascuñán's alleged injuries involving property located outside of the United States, the fact that Elsaca or his codefendants transferred those stolen funds to (or through) the United States fails to transform an otherwise foreign injury into a domestic one. As noted, however, Bascu-

ñán has alleged two injuries that have a sufficient relationship to the United States to qualify as "domestic" under the circumstances presented here.

Accordingly, we **REVERSE** the District Court's order granting Elsaca's motion to dismiss, we **VACATE** the District Court's order denying Bascuñán's motion for leave to file a second amended complaint, and we **REMAND** the cause to the District Court for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Overview

■ We review *de novo* the grant of a motion to dismiss, "accept[ing] all factual allegations in the complaint as true and draw[ing] inferences from those allegations in the light most favorable to the plaintiff."[5] The relevant facts, as presented in Bascuñán's Amended Complaint, are as follows:

Bascuñán, an only child, inherited a substantial fortune (the "Estate") from his parents after their deaths in the 1990s. The Estate includes various companies and assets owned (directly and indirectly) by Bascuñán, including shares in Banco de Credito e Inversiones ("BCI"), the third-largest bank in Chile, of which his father had been president.[6] At the time of his parents' death, and for years afterward, Bascuñán, who was afflicted with a number of emotional and physical ailments including depression and acquired immunodeficiency syndrome ("AIDS"), was unable to manage his own finances. He relied instead

---

**5.** *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997).

**6.** The other named plaintiffs-appellants—Tarascona Corp., Hofstra Corp., Inmobiliaria Milano S.A., Inmobiliaria E Inversiones Tauro S.A., and Inversiones T & V S.A.—are

entities owned and controlled by Bascuñán, and are part of the Estate. For clarity and ease of reference, we use Bascuñán's name throughout this decision in lieu of referring to the plaintiffs jointly.

on a financial manager originally hired by his parents.

In 1999, Bascuñán appointed his cousin Elsaca as a new financial manager to oversee the Estate. Elsaca, who was eight years Bascuñán's senior, was a trusted family member with a master of business administration ("MBA") degree from the London School of Economics and extensive financial experience. According to Bascuñán's complaint, Elsaca was "a licensed accountant, prominent Chilean economist, and [formerly] the head of the *Superintendencia de Valores y Seguros (de Chile)*, Chile's equivalent to the U.S. Securities and Exchange Commission."[7] Bascuñán ultimately granted Elsaca a broad power of attorney, which included the power to engage in self-dealing transactions without Bascuñán's prior authorization.

Over the next ten years, and until Bascuñán fired him in 2010, Elsaca and his co-defendants[8] allegedly engaged in a number of fraudulent financial schemes against Bascuñán, illegally transferring about $64 million from the Estate to entities and accounts under their own control. Specifically, Bascuñán claimed that Elsaca perpetrated four schemes: (1) the New York Trust Account Scheme; (2) the General Anacapri Investment Fraud Scheme; (3) the BCI Share Theft; and (4) the Dividend Scheme. We describe each scheme in turn, focusing on the injuries purportedly caused by each.

## A. The New York Trust Account Scheme

In 1998, before he hired Elsaca to manage his finances, Bascuñán established the so-called Afghan Trust with money from the Estate. The Afghan Trust, a vehicle for Bascuñán's charitable giving, was organized under the laws of the Cayman Islands and is administered by the New York office of J.P. Morgan. Importantly, its funds are held in New York in a J.P. Morgan bank account.

In 2001, Elsaca, then in control of Bascuñán's finances, created a second trust: the Capri Star Trust. According to Bascuñán, the Capri Star Trust—the stated purpose of which was also to finance Bascuñán's charitable goals—was entirely redundant of the already-existing Afghan Trust, and "served no purpose other than to generate sham fees" for his cousin.[9] The only difference between the two trusts was that the Capri Star Trust named Elsaca as an "Investment Advisor," which entitled him to receive an "Investment Advisor" fee of 1% of the total value of the Capri Star Trust's assets each year, notwithstanding the fact that UBS (not Elsaca) actively managed the Trust.[10] According to Bascuñán, Elsaca transferred funds from the Afghan Trust's New York bank account into the Capri Star Trust solely to earn sham investment fees ($2.7 million in total), and to pay sham legal fees ($390,000 in total) to José Pedro Silva Prado, Elsaca's personal attorney and alleged co-conspirator.

---

**7.** Joint Appendix ("JA") 25 (italics added).

**8.** The individual co-defendants-appellees are Cristián Jara Taito, the general manager of a shell company used by Elsaca, and Oscar Bretón Dieguez, whom Elsaca appointed as an accountant for the Estate. The remaining co-defendants-appellees—GM & E Asset Management S.A., Fintair Finance Corp., Euweland Corp., Hay's Finance Corp., Cary Equity's Corp., Agrícola E Inmobiliaria Chauquén

Limitada, and Alapinjdp Investing Corp.—are corporate entities owned and controlled (directly and indirectly) by Elsaca. Again, for clarity and ease of reference, we use only Elsaca's name when we might otherwise have referred to the defendants jointly.

**9.** JA 28.

**10.** *Id.*

Like the Afghan Trust, the Capri Star Trust was established in the Cayman Islands and administered by the New York office of a banking and financial services institution (in this instance, UBS AG).

## B. The General Anacapri Investment Fraud Scheme

The next purported scheme, which Bascuñán dubbed the Anacapri Investment Fraud Scheme, involved several byzantine sub-schemes and resulted in Elsaca, and others, illegally transferring at least $60 million from the Estate to accounts and entities under their control. Simply put, Elsaca created a private investment fund in Chile—the Anacapri Fund (or "the Fund")—that took in a substantial amount of money from the Estate and paid back very little: it returned to the Estate only $7.5 million of the approximately $48 million it had under management. According to Bascuñán, Elsaca and his associates simply pocketed most of the Estate assets controlled by the Anacapri Fund; that is, they transferred large sums of money to themselves several times during the Fund's eight-year existence and retained most of the assets after they liquidated the Fund in 2009.[11] The Estate also paid Elsaca investment management fees amounting to approximately 30% of the total value of the assets contributed to the Anacapri Fund, or about $16 million.[12]

The Anacapri Fund was financed with assets contributed by three foreign entities controlled by the Estate. The Amended Complaint does not describe where the money belonging to those foreign entities

was held. Bascuñán did allege that, after misappropriating assets from the Anacapri Fund, Elsaca laundered those assets through bank accounts in New York and elsewhere.

## C. Theft of BCI Shares

One of the Anacapri sub-schemes—the BCI Share Theft—requires a somewhat more detailed description. As mentioned above, the Estate included a 1.47% stake in BCI. An entity called Tarascona Corp. ("Tarascona") directly controlled the shares comprising that stake, and Tarascona was itself wholly owned by Hofstra Corp. ("Hofstra"), an entity belonging to the Estate. Both Tarascona and Hofstra were corporations organized under the laws of the British Virgin Islands ("BVI") and Hofstra's interest in Tarascona was represented by bearer shares stored in a J.P. Morgan safety deposit box in New York.

In 2007, Elsaca, or an agent acting on his behalf, traveled to New York and, using the authority granted him in the power of attorney, removed the bearer shares from the safety deposit box. Elsaca then arranged for a Panamanian law firm to cancel Hofstra's bearer shares and re-register them in the name of a new entity created and controlled by him, Nueva T Corp. (or "New Tarascona"), a BVI corporation.[13] This maneuver effectively transferred control of Tarascona and its only asset, the BCI shares, from the Estate to Elsaca.

---

**11.** Bascuñán alleged that Elsaca operated this scheme using a number of shell companies, disguising the fact that he was the ultimate beneficiary of several large transfers made by the Anacapri Fund between 2001 and 2009 and of the Fund's final liquidation sale in 2009.

**12.** This, too, was accomplished through the use of a shell company.

**13.** Elsaca controlled New Tarascona by means of a shell company called Euweland, also a BVI corporation wholly owned by Elsaca.

At the last step of the BCI Share Theft sub-scheme, Elsaca caused the Anacapri Fund to use Estate assets to purchase New Tarascona, and thus (re)purchase the BCI shares, from him for $43 million.

## D. The Dividend Scheme

Finally, Bascuñán alleged that Elsaca stole over $1.8 million in dividend payments earned by the Estate on its BCI shares. Between 2007 and 2010, a Tarascona account held at BCI in Chile received over $3.5 million in dividend payments. Elsaca diverted a portion of those funds from the Tarascona account to his personal investment accounts at Morgan Stanley in New York. This purported scheme was rather crude by comparison with the others: Elsaca withdrew funds derived from the dividend payments by writing checks out of the Tarascona account, he endorsed those checks in his own name, and then he deposited the funds into his own accounts.

## II. Procedural History

On March 17, 2015, Bascuñán filed an initial complaint, followed by an amended complaint on August 24, 2015, accusing Elsaca and his co-defendants of violating RICO by continuously and systematically breaching the mail fraud, wire fraud, bank fraud, anti-money-laundering, and Travel Act statutes through their actions involving the Estate. On December 22, 2015, the defendants moved to dismiss Bascuñán's action on several grounds, including for failure to state a claim upon which relief

can be granted under Federal Rule of Civil Procedure 12(b)(6).

Six months later, after the District Court heard oral argument on the defendants' fully-briefed motion, the Supreme Court issued its decision in *RJR Nabisco*, which for the first time required a plaintiff bringing a private action under RICO to allege a "domestic injury."[14] In response to the Supreme Court's decision, Bascuñán sought leave to file a second amended complaint.

The District Court denied as futile his motion for leave to amend and simultaneously granted the defendants' pending motion to dismiss, solely on the ground that Bascuñán failed to meet civil RICO's new "domestic injury" requirement.

In determining whether Bascuñán's complaint set forth a domestic injury, the District Court characterized "[t]he RICO injury alleged [as] an economic loss of approximately $64 million."[15] It did not consider whether each of the four fraudulent schemes alleged by Bascuñán caused separately cognizable RICO injuries to property or business, but concluded instead that Bascuñán suffered a single "economic loss."[16]

Then, in order to decide where in geographic terms it should locate that "economic loss," the District Court drew an analogy to the tort claim accrual rules under Section 202 of the New York Civil Practice Law and Rules ("NYCPLR"), New York State's so-called "borrowing statute."[17] It observed that, "[w]hen apply-

---

14. 136 S.Ct. at 2111.

15. *Bascuñán v. Daniel Yarur ELS*, No. 15-CV-2009 (GBD), 2016 WL 5475998, at *6 (S.D.N.Y. Sept. 28, 2016).

16. *Id.*

17. *Id.* at *4. NYCPLR § 202 provides in full:
 An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.
 A cause of action "accrues" when it "come[s] into existence as an enforceable claim or

ing this statute to determine where an economic injury accrued, courts typically ask two common-sense questions: [1] who became poorer, and [2] where did they become poorer."[18] That inquiry, according to the District Court, "usually focuses upon where the economic impact of the injury was ultimately felt," which "is normally the state of plaintiffs['] residence."[19]

In reliance on that analogy, the District Court held that "[a]ll of the funds at issue ... were purportedly owned by Bascuñán, and thus, he is the person that ultimately suffered the loss. And as a Chilean citizen and resident, he suffered the losses in Chile."[20] It then dismissed Bascuñán's RICO action for failure to allege a domestic injury.

The District Court favored this residency-based test primarily because it "focuse[d] on the *plaintiff* and where the alleged injury was *suffered*," as opposed to focusing on the defendant's conduct.[21] It read *RJR Nabisco* as standing for the proposition that "the location where the *plaintiff suffered* the alleged injury dictates whether the plaintiff may pursue a private right of action under § 1964(c)."[22]

## DISCUSSION

The sole question on appeal, subject to our *de novo* review, is whether Bascuñán plausibly alleged "a *domestic* injury to business or property."[23] No Court of Appeals has yet to consider how to determine whether a civil RICO injury is "domestic" or "foreign."

As explained more fully below, we hold, as an initial matter, that where a civil RICO plaintiff alleges separate schemes that harmed materially distinct interests to property or business, each harm—that is to say, each "injury"—should be analyzed separately for purposes of this inquiry. Next, we hold, contrary to the District Court, that a plaintiff who is a foreign resident may nevertheless allege a civil RICO injury that is domestic. At a minimum, when a foreign plaintiff maintains tangible property in the United States, the misappropriation of that property constitutes a domestic injury. With respect to some of the schemes in the Amended Complaint, Bascuñán has alleged the misappropriation of tangible property located in the United States and thus, to that extent, has

right." BLACK'S LAW DICTIONARY 25 (10th ed. 2014).

**18.** *Bascuñán*, 2016 WL 5475998, at *4 (quoting *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*, No. 12 CIV. 4025 (AT), 2013 WL 6667601, at *6 (S.D.N.Y. Dec. 17, 2013)) (internal quotation marks omitted).

**19.** *Id.* (internal quotation marks omitted).

**20.** *Id.* at *6 (internal citation omitted).

**21.** *Id.* In the District Court, Bascuñán, looking to New York State's personal jurisdiction long-arm statute, NYCPLR § 302(a)(3), argued that injuries to persons or property occur where "the location of the original event causing the injury [occurred]," *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d

Cir. 2001), and that, because Elsaca acted in New York to misappropriate certain funds, Bascuñán's alleged injuries were "domestic."

**22.** *Bascuñán*, 2016 WL 5475998, at *5.

**23.** *Id.* (emphasis added). A complaint will survive a motion to dismiss if it contains "enough facts to a state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We need not and do not decide whether Bascuñán's complaint satisfies any of the other requirements for an actionable civil RICO claim.

alleged a domestic injury. We therefore reverse the judgment of the District Court.

## I. RICO's Statutory Framework

In enacting RICO, which is Title IX of the Organized Crime Control Act of 1970, Congress "establish[ed] new penal prohibitions, and ... provid[ed] enhanced sanctions and new remedies" in order to thwart and punish individuals seeking to use illegal means and ends "to infiltrate and corrupt legitimate business."[24] Although commonly associated with the national effort to eradicate organized crime in America, "Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways."[25]

■ Specifically, RICO created "four new criminal offenses involving the activities of organized criminal groups in relation to an enterprise."[26] Those offenses are "founded on the concept of racketeering activity," which "[t]he statute defines ... to encompass dozens of state and federal offenses, known in RICO parlance as predicates."[27] A party commits a RICO violation when he engages in a "pattern of racketeering activity—a series of related predicates that together demonstrate the existence or threat of continued criminal

activity"—in order to "infiltrate, control, or operate a[n] enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."[28]

Those four specific prohibitions, which are set forth in Section 1962 of RICO, were authoritatively summarized as follows:

> Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise. Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity. Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. Finally, Section 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.[29]

In addition, Section 1963(a) of RICO makes any violation of those four prohibitions subject to criminal penalties. Sections 1964(a) and (b) authorize the Attorney General of the United States to bring civil proceedings to enforce those prohibitions.[30] And Section 1964(c) of RICO, which is the focus of this appeal, permits "[a]ny person injured in his business or property by reason of a violation of section 1962" to bring

---

24. Pub. L. No. 91-452, 84 Stat. 922, 923 (1970) (Statement of Findings and Purpose); *see also Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 320 (2d Cir. 2011) (discussing the purposes behind RICO).

25. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248–49, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

26. *RJR Nabisco*, 136 S.Ct. at 2096.

27. *Id.* For example, the statute defines "racketeering activity" to include "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled

substance ... which is chargeable under State law and punishable by imprisonment for more than one year" as well as any act indictable under certain federal provisions including those prohibiting mail fraud, wire fraud, and financial institution fraud. 18 U.S.C. § 1961(1).

28. *RJR Nabisco,* 136 S.Ct. at 2096–97 (internal quotation marks omitted).

29. *Id.* at 2097.

30. *Id.*

a private civil suit in federal district court and authorizes the recovery of treble damages, attorney's fees, and costs.[31]

## II. RICO and Issues of Extraterritoriality

### A. The Supreme Court's Decision in RJR Nabisco

In *RJR Nabisco*, the Supreme Court considered whether the RICO statute applies extraterritorially. The Court determined, as an initial matter, that "[t]he question of RICO's extraterritorial application really involves two questions": (1) "do RICO's substantive prohibitions, contained in § 1962, apply to conduct that occurs in foreign countries?" and (2) "does RICO's private right of action, contained in § 1964(c), apply to injuries that are suffered in foreign countries?"[32] In answering both questions, the Court applied the presumption against extraterritoriality: a canon of statutory construction that requires courts to construe federal laws "to have only domestic application" unless there is a clear and unmistakable indication that Congress intended the law to apply abroad.[33]

With respect to the first question, the Court held that "RICO applies to *some*

foreign racketeering activity," explaining that "[a] violation of § 1962 may be based on a pattern of racketeering that includes predicate offenses committed abroad, provided that each of those offenses violates a predicate statute that is itself extraterritorial."[34]

On the second question, the one directly relevant to this appeal, the Court concluded that Section 1964(c), the civil RICO provision, "[i]rrespective of any extraterritorial application of § 1962," does not overcome the presumption against extraterritoriality and, consequently, a plaintiff must allege a domestic injury.[35]

In answering the second question, the Court made a point of separately applying the presumption against extraterritoriality to Section 1964(c). It concluded that the presumption against extraterritoriality applies not just to "the question of what conduct falls within a statute's purview" but also to a statute's creation of a private right of action, because "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct."[36] For instance, drawing a compari-

---

**31.** In full, Section 1964(c) provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.'

*See also* G. Robert Blakey, *The Rico Civil Fraud Action in Context: Reflections on Ben-*

*nett v. Berg*, 58 Notre Dame L. Rev. 237, 249–280 (1982) (on the legislative history of RICO); Michael Goldsmith, *Judicial Immunity for White-Collar Crime: The Ironic Demise of Civil Rico*, 30 Harv. J. on Legis. 1, 6–8 (1993) (same).

**32.** 136 S.Ct. at 2099.

**33.** *Id.* at 2100 (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010)).

**34.** *Id.* at 2103 (emphasis added).

**35.** *Id.* at 2106.

**36.** *Id.* (internal quotation marks and emphasis omitted).

son to antitrust law's treble damages remedy, the Court noted that it had previously been told by foreign governments that applying U.S. civil remedies to foreign conduct "would unjustifiably permit [foreign] citizens to bypass their own [nation's] less generous remedial schemes."[37] Nevertheless, the Supreme Court stated that the "domestic injury" requirement of Section 1964(c)—more specifically, the fact that RICO's private right of action lacks language expressly providing recovery for injuries to foreign persons—"does not mean that foreign plaintiffs may not sue under RICO."[38]

Ultimately, because the plaintiffs had stipulated that they waived their damages claims for any domestic injuries, the Court did not explain how to identify a "domestic injury" and noted only that "[t]he application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'"[39]

## B. The "Domestic Injury" Determination

The guidance from the Supreme Court in *RJR Nabisco* regarding what constitutes a domestic injury is admittedly sparse. The Court held that "[s]ection 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property," but it did not indicate

what factors a court should examine to determine whether a plaintiff's alleged injury is foreign or domestic.[40] We will now turn to the schemes alleged here and their accompanying injuries.

■ Before doing so, however, we note that the District Court erred in its preliminary approach to discerning Bascuñán's injuries. The District Court's generic characterization of Bascuñán's alleged injuries as "an economic loss of approximately $64 million" is not helpful in determining whether, for purposes of the presumption against extraterritoriality, his particular injuries were foreign or domestic.[41] All civil RICO injuries are, by the terms of the statute itself, economic losses of one kind or another. A plaintiff bringing a civil RICO claim must allege an injury to his "business or property"[42]; he cannot, for example, recover for "personal injuries."[43] As we have explained, "[t]he requirement that the injury be to the plaintiff's business or property means that the plaintiff must show a proprietary type of damage,"[44] or, in other words, an "economic injury."[45]

■ In order to determine where the economic losses alleged by a civil RICO plaintiff are located geographically, courts must examine more closely the specific type of injuries alleged. It is not enough simply to label the business or property injuries, tautologically, as "economic" injuries. Because, as the Supreme Court ex-

---

37. *Id.* at 2106–07 & n.9 (citing *amici curiae* briefs filed by the Federal Republic of Germany, the United Kingdom, and Canada in the matter of *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004)).

38. *Id.* at 2110 n.12.

39. *Id.* at 2111.

40. *Id.*

41. *Bascuñán*, 2016 WL 5475998, at *6.

42. 18 U.S.C. § 1964(c).

43. *RJR Nabisco*, 136 S.Ct. at 2108

44. *Bankers Tr. Co. v. Rhoades*, 741 F.2d 511, 515 (2d Cir. 1984), *vacated on other grounds*, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985).

45. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151, 107 S.Ct. 2759, 97 L.Ed.2d 121, (1987) (explaining that civil RICO was "designed to remedy economic injury").

plained, "[t]he application of th[e domestic injury] rule in any given case will not always be self-evident,"[46] this analysis will, as a general matter, depend on the particular facts alleged in each case. In addition, if a plaintiff alleges more than one injury, courts should separately analyze each injury to determine whether any of the injuries alleged are domestic. If one of the alleged injuries is domestic, then the plaintiff may recover for that particular injury even if all of the other injuries are foreign.[47]

Accordingly, we begin our analysis with the schemes that are easiest to analyze: the Dividend Scheme and the General Anacapri Investment Fraud Scheme. We then examine the more complex issues raised by the New York Trust Account Scheme and the BCI Share Theft, in turn.

### C. Elsaca's Alleged Use of Domestic Bank Accounts

■ We conclude that both the Dividend Scheme and the General Anacapri Investment Fraud Scheme failed to allege a "domestic" injury. With respect to the Dividend Scheme, Bascuñán alleged that Elsaca stole funds that were legally owned by a foreign corporation (and beneficially owned by Bascuñán himself, a foreign citizen and resident) and held in a foreign bank account. The only domestic element alleged is that Elsaca transferred these foreign funds to his own accounts in New York. Similarly, the only domestic elements of the General Anacapri Investment Fraud Scheme pertain to Elsaca's laundering of stolen money using bank accounts in the United States and elsewhere.[48]

That is not enough to allege a domestic injury. Indeed, one could argue that such allegations are insufficient under a straightforward application of *RJR Nabisco*, as allegations similar to Bascuñán's were levied in *RJR Nabisco* itself.[49] Bascuñán does not even expressly argue that transferring money to (or through) the

**46.** *RJR Nabisco*, 136 S.Ct. at 2111.

**47.** *Id.* (explaining that "Section 1964(c) requires a civil RICO plaintiff to allege prove *a domestic injury to business or property* and does not allow recovery for foreign injuries" (emphasis added)).

**48.** While Bascuñán argues in his brief that both of these schemes involved the seizure of assets out of New York-based accounts, we find no support for his assertions in the portions of the Amended Complaint he cites. *See* Plaintiffs' Brief 30. In addition, Bascuñán cites portions of the proposed SAC to support his assertion that these two schemes damaged property located within the United States. *Id.* However, as we explain below, we do not consider allegations made in Bascuñán's proposed SAC in deciding this appeal.

**49.** As Justice Ginsburg, writing separately in *RJR Nabisco*, observed:

All defendants are U.S. corporations, headquartered in the United States, charged with a pattern of racketeering activity directed and managed from the United States, involving conduct occurring in the United States. In particular, according to the complaint, defendants received in the United States funds known to them to have been generated by illegal narcotics trafficking and terrorist activity, conduct violative *2115 of § 1956(a)(2); traveled using the facilities of interstate commerce in furtherance of unlawful activity, in violation of § 1952; provided material support to foreign terrorist organizations "in the United States and elsewhere," in violation of § 2339B; and used U.S. mails and wires in furtherance of a "scheme or artifice to defraud," in violation of §§ 1341 and 1343. App. to Pet. for Cert. 238a–250a.

*Id.* at 2114–15 (Ginsburg, J., concurring in part and dissenting in part); *see also id.* at 2116 (Breyer, J., concurring in part and dissenting in part) ("I note that this case does not involve the kind of purely foreign facts that create what we have sometimes called "foreign-cubed" litigation (*i.e.*, cases where the plaintiffs are foreign, the defendants are foreign, and all the relevant conduct occurred abroad.")).

United States makes his alleged injuries "domestic." Instead, he seems to argue only that "where the alleged RICO injury is the misappropriation of property located within the territorial jurisdiction of the United States, [plaintiffs] have plainly alleged a domestic RICO injury to their business or property."[50]

 We ultimately conclude that an injury to tangible property is generally a domestic injury only if the property was physically located in the United States, and that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one. We thus hold that the use of bank accounts located within the United States to facilitate or conceal the theft of property located outside of the United States does not, on its own, establish a domestic injury. To hold otherwise would subvert the intended effect of the "domestic injury" requirement articulated by the *RJR Nabisco* Court. Because of the primacy of American banking and financial institu-tions, particularly those in New York, a transnational RICO case is often likely to involve in *some* way, however insignificant, financial transactions with American institutions. Holding that a *defendant's* mere use of a domestic bank account could transform an otherwise foreign injury into a domestic one might well effectively eliminate the effect of the domestic injury requirement in a large number of cases.[51] In addition, and importantly, the only domestic connections alleged here were acts of *the defendant*. Bascuñán and his relevant property always remained abroad, and these injuries did not arise from any preexisting connection between Bascuñán and the United States. To allow such a plaintiff to recover treble damages would thus "unjustifiably permit [foreign] citizens to bypass their own [nation's] less generous remedial schemes."[52]

 Accordingly, at least insofar as they are pleaded in the Amended Complaint, these schemes fail to allege a domestic injury.[53]

50. Plaintiffs' Brief 31–32.

51. *See, e.g.,* U.S. Dep't of State, Money Laundering and Financial Crimes (2001), https://www.state.gov/j/inl/rls/nrcrpt/2000/959.htm (describing enforcement cases involving foreign entities laundering criminal proceeds through the United States). *Cf. Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.,* 585 F.3d 58, 61–62 (2d Cir. 2009) (explaining the negative practical consequences of a legal rule that treated the momentary passage of electronic funds through New York banks as "sufficient to vest jurisdiction in the United States District Court of the Southern District of New York"); Permanent Editorial Bd. for the Uniform Commercial Code, PEB Commentary No. 16: Sections 4A–502(d) and 4A–503, at 5 n. 4 (July 1, 2009) (same).

52. *RJR Nabisco,* 136 S.Ct. at 2106–07.

53. After the Supreme Court issued its decision in *RJR Nabisco,* Bascuñán sought leave to file a second amended complaint (the "SAC"). The SAC alleged an additional scheme not otherwise mentioned in the Amended Complaint, the "Tarascona Laundering Scheme," and added more detail to the allegations regarding the four schemes already pleaded. Bascuñán argues on appeal that the allegations contained in the SAC (in combination with those set forth in the Amended Complaint) plausibly alleged the existence of several domestic injuries because they asserted that Elsaca stole assets out of accounts located in New York. *See* Plaintiff's Brief 30. However, the District Court denied Bascuñán's motion for leave to file the SAC as futile, at the same time as it granted Elsaca's motion to dismiss, because it too failed to allege a domestic injury, presumably for the same reason. *See Bascuñán,* 2016 WL 5475998, at *6 n.16 (stating only that "the proposed Second Amended Complaint also fails to sufficiently allege a domestic RICO injury").

As we have already stated, we conclude that the District Court committed a legal error in

### D. Foreign-Owned Property Located Within the United States

The New York Trust Account Scheme and the BCI Share Theft, on the other hand, allege that certain property—although belonging to a foreign owner—was located within the United States when it was stolen. As explained below, we conclude that the District Court erred in holding that these schemes caused only foreign injuries.

### 1. The New York Trust Account Scheme

■ We start with the New York Trust Account Scheme, in which Elsaca misappropriated funds held in a New York bank account at J.P. Morgan. This alleged injury is an injury to property; money, as has been observed in a variety of other contexts, is property.[54] Moreover, this injury is analogous to an injury to tangible property, by which we mean property that can be fairly said to exist in a precise location.[55] While money is, of course, ultimately fungible, the money allegedly stolen as a result of this scheme was situated in a specific geographic location at the time of injury such that we can treat it as tangible property for purposes of this inquiry.

■ Accordingly, we consider this scheme to have involved the misappropriation of tangible property located within the United States.[56] Where the injury is to tangible property, we conclude that, absent some extraordinary circumstance, the injury is domestic if the plaintiff's property

relying on Bascuñán's place of residence to determine whether or not Bascuñán plausibly alleged a domestic injury under the circumstances presented here. We also conclude that, when examined under the proper legal framework, Bascuñán's Amended Complaint sets forth domestic injuries. Because we find it necessary to reinstate Bascuñán's Amended Complaint, we do not consider the allegations set forth in the proposed SAC to be before us at this time. Instead, because it was based on the same legal error, we go only so far as to vacate the District Court's denial of Bascuñán's motion to amend his complaint and leave it to the District Court to determine, in the first instance, whether any further amended complaint is futile in light of our ruling. *See Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87 (2d Cir. 2002) (explaining that we review *de novo* the denial of a motion for leave to amend that is "based on an interpretation of law" and that "[l]eave to amend a complaint shall be freely given when justice so requires"); *cf. Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 244–45 (2d Cir. 2007) (remanding to the district court to "consider whether to allow the already-submitted proposed amended complaint or allow submission of another one" where the "district court's futility analysis rested on an incorrect conclusion of law," and in light of a district court's "discretion to limit the time for amendment of the pleadings").

**54.** *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 338, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("In its dictionary definitions and in common usage 'property' comprehends anything of material value owned or possessed. Money, of course, is a form of property." (citation omitted)); *LoPresti v. Terwilliger*, 126 F.3d 34, 41–42 (2d Cir. 1997) (observing that, under New York law an action will lie, in certain circumstances, for the conversion of money).

**55.** Because it has "physical form and characteristics," BLACK'S LAW DICTIONARY 1412 (10th Ed. 2014), tangible property can be said to exist in a precise location.

**56.** If we draw an analogy to the way money is treated in a claim for conversion, which is defined as "[t]he wrongful possession or disposition of another's property as if it were one's own," *id.* at 406, and thus is a particularly appropriate comparison given the facts alleged here, it is well settled, at least under New York law, "that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 160 A.D.2d 113, 124, 559 N.Y.S.2d 704 (1st Dep't 1990).

was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad.[57] Several considerations support such a rule.

First and foremost, this rule accords with *RJR Nabisco* and furthers the principles animating the presumption against extraterritoriality. The principal justification for the domestic injury requirement, according to *RJR Nabisco*, is the need to avoid "international friction."[58] Foreign persons and entities that own private property located within the United States expect that our laws will protect them in the event of damage to that property. That modest expectation is entirely justified, especially when we consider that a foreign resident's property located in the United States is otherwise subject to all of the regulations imposed on private property by American state and federal law. We see no reason, in the text of the RICO statute or in the *RJR Nabisco* decision, why we should exclude private property of this

kind from the remedial benefits conferred by RICO's private right of action.

Few things could be more destructive to the comity underlying the international system than legal rules that penalize international economic cooperation and deter foreign investment simply because such activity involves "foreign" counterparties. Indeed, the majority in *RJR Nabisco* took care to make plain that its opinion should *not* be taken to "mean that foreign plaintiffs may not sue under RICO."[59] That, of course, is exactly the effect of the District Court's residency-based test. Our rule, on the other hand, does not discriminate against foreigners who own property in the United States: it ensures that both foreign and domestic plaintiffs can obtain civil RICO's remedy for damage to their property, but only if their property was located within the territorial jurisdiction of the United States.[60] In so doing, it protects the interest each sovereign has in regulating the private property situated in its own

---

**57.** Another district court in this Circuit has utilized a similar test. *See Elsevier, Inc. v. Grossman*, 199 F.Supp.3d 768, 786 (S.D.N.Y. 2016) (holding that "if the plaintiff has suffered an injury to his or her property, the court should ask where the plaintiff parted with the property or where the property was damaged" in order to determine where the injury occurred).

**58.** *RJR Nabisco*, 136 S.Ct. at 2106.

**59.** *Id.* at 2110 n.12. Justice Ginsburg, in her opinion concurring in part and dissenting in part in *RJR Nabisco*, an opinion on which the District Court heavily relied, concluded that Justice Alito's opinion for the Court made civil RICO litigation "available to domestic but not foreign plaintiffs." *Id.* at 2115. With respect, we think that this was a misreading of the Majority's opinion.

Justice Alito concluded, on the basis of prior precedent, that the Court should apply the presumption against extraterritoriality to the RICO statute's private right of action, in addition to its substantive prohibitions. *Id.* at

2106. He then determined that nothing in Section 1964(c) established that the statute reaches foreign injuries and, as a result, a civil RICO plaintiff must allege a domestic injury. *Id.* at 2108. He expressly declined to indicate what constitutes a domestic or foreign injury and, despite Justice Ginsburg's reading to the contrary, never equated the location of a civil RICO plaintiff's place of residence with the location of that plaintiff's alleged injury. *Id.* at 2111. Instead, in the context of explaining why civil RICO, unlike Section 4 the Clayton Act, 15 U.S.C. § 15, does not apply to foreign injuries (disagreeing with Justice Ginsburg on that specific point), Justice Alito stated that civil RICO's failure to provide recovery for foreign injuries "does not mean that foreign plaintiffs may not sue under RICO," *RJR Nabisco*, 136 S.Ct. at 2110 & n.12.

**60.** *See, e.g., United States v. Federative Republic of Brazil*, 748 F.3d 86, 94 (2d Cir. 2014) (holding that funds in a bank account at the New York branch of a major bank were located "within the jurisdiction of the United States").

territory without extending the reach of American law or discriminating against foreign plaintiffs.[61] Accordingly, our holding *reduces* the possibility of international discord.

We also draw guidance from the approach taken by the Restatement (Second) of Conflicts of Laws in resolving substantive choice-of-law issues in the context of trans-jurisdictional torts, specifically torts involving "Injuries to Tangible Things."[62] The Second Restatement's presumptive choice-of-law rule regarding "Injuries to Tangible Things" directs that "the local law of the state *where the injury occurred to the tangible thing* will usually be applied to determine most issues involving the tort ... on the rare occasions when conduct and the resulting injury to the thing occur in different states."[63] Our holding, treating injuries involving tangible property located within the jurisdiction of the United States as "domestic," accords with that presumptive rule.

We consider that rule to be an appropriate reference for determining the location of Bascuñán's alleged injuries because the interests considered by the Second Restatement mirror the concerns underlying the presumption against extraterritoriality. The Second Restatement explains that "[t]he rights and liabilities of the parties with respect to an issue in tort are deter-mined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."[64] Those principles include, among others, "the needs of the ... international system[ ]," "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," and "the protection of justified expectations."[65]

Elsaca's principal counterarguments are unpersuasive.

First, Elsaca argues that our rule is inappropriate here because Bascuñán's alleged injuries are a special type of property injury: an injury to *financial property*. He argues that "different rules may apply in cases involving damage to a business or non-financial property, such as real-estate or chattels," than apply when the alleged damage is to financial property.[66] This suggested distinction between financial and non-financial property is unhelpful in the circumstances presented here. The fact that the property at issue was money, rather than real property or chattels, is of no moment. Bascuñán plausibly alleged that the funds stolen were held in a specific and identifiable bank account in New York. In that sense, the Afghan Trust resembled real property or chattels in the

---

**61.** *See Frick v. Com. of Pennsylvania,* 268 U.S. 473, 492–93, 45 S.Ct. 603, 69 L.Ed. 1058 (1925) ("A nation within whose territory any personal property is actually situate has as entire dominion over it while therein, in point of sovereignty and jurisdiction, as it has over immovable property situate there. It may regulate its transfer, and subject it to process and execution, and provide for and control the uses and disposition of it, to the same extent that it may exert its authority over immovable property." (internal quotation marks omitted)).

**62.** Restatement (Second) of Conflicts of Laws §§ 145, 147 (1971); *see generally* Christopher A. Whytock, *Myth or Mess? International Choice of Law in Action,* 84 N.Y.U. L. Rev. 719, 724–30 (2009) (discussing the development of choice of law doctrine in the United States).

**63.** Restatement (Second) of Conflicts of Laws § 147 cmt. e

**64.** *Id.* § 145.

**65.** *Id.* § 6(2).

**66.** Defendants' Brief 29.

only way relevant to our decision—that is, the trust funds could be located within the jurisdiction of the United States at all times relevant to the complaint. Elsaca cannot change that critical fact simply by labeling Bascuñán's injury "financial."

Next, Elsaca relies on *Atlantica Holdings* to argue that "a residence-based rule [ ] conforms with this Court's approach to determining where a plaintiff has allegedly suffered a financial injury for purposes of other federal statutes."[67] Based on the circumstances presented here, however, we hold that our *Atlantica Holdings* decision is inapposite.[68]

In that case, U.S. plaintiffs brought securities fraud claims against entities from Kazakhstan, alleging that the defendants drastically misrepresented the value of shares that the plaintiffs had purchased.[69] In considering whether the plaintiffs had alleged a direct effect for purposes of the Foreign Sovereign Immunities Act, we relied there, too, on choice-of-law rules for torts (albeit the First Restatement), and held that there was a "direct effect" in the United States because that was where the plaintiffs resided.[70] Although we looked to the plaintiffs' residence in *Altantica Holdings*, we do not think a similar method is appropriate here because of the different property interests at issue. The injury alleged in *Atlantica Holdings* involved the diminished value of ownership interest in a company, for which the clear locational nexus was the shareholder's place of residence. On the contrary, Bascuñán alleged an injury—the theft of specific assets from bank accounts located in New York—for which the locus of the injury is clearly domestic.

Finally, Elsaca argues that conflict-of-laws rules, of which New York's borrowing statute is a part and on which the District Court relied, provide an appropriate framework for analyzing civil RICO's domestic injury requirement precisely because "they serve the same policies as the presumption against extraterritoriality."[71] We agree with the general proposition that the "most important function" of conflict-of-laws rules, like the presumption against extraterritoriality, "is to make the interstate and international systems work well,"[72] but the particular conflict-of-law rule relied on by Elsaca and the District Court is inapposite.

New York's "borrowing statute"—part of that state's choice-of-law rules regarding claim accrual—is designed to protect *defendants* from suits that would be barred by shorter statutes of limitations in other jurisdictions where a plaintiff could have brought suit.[73] It does not account for the interest a foreign sovereign may have in the application (or not) of a particular jurisdiction's substantive or remedial law.[74] In contrast, the substantive choice-of-laws

---

67. *Id.* at 26.

68. 813 F.3d 98 (2d Cir. 2016).

69. *Id.* at 102–06.

70. *Id.* at 108–111 (2d Cir. 2016).

71. Defendants' Brief 23.

72. *Id.* (quoting Restatement (Second) of Conflict of Laws § 6 cmt. d).

73. *See Sack v. Low,* 478 F.2d 360, 367 (2d Cir. 1973) (observing that "the policy behind the borrowing statute is to protect New York resident-defendants from suits in New York that would be barred by shorter statutes of limitations in other states where non-resident-plaintiffs could have brought suit").

74. *See RJR Nabisco,* 136 S.Ct. at 2100 (explaining that one of the several reasons for the presumption against extraterritoriality is that "it serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries").

rules set forth in the Second Restatement, the goal of which is to select the law with the most significant relationship to the legal issues and parties before the court, consider a range of factors to identify the appropriate law.[75] Those conflict-of-laws rules *do* protect the interest of foreign jurisdictions. That is, in part, why we considered the substantive conflict-of-laws rule applicable to "Injuries to Tangible Things" to be helpful in determining whether Bascuñán's alleged injuries were foreign or domestic.[76]

To be clear, we do not hold that a plaintiff's place of residence is *never* relevant to the domestic injury inquiry required by *RJR Nabisco*. A plaintiff's residence may often be relevant—perhaps even dispositive—in determining whether certain types of business or property injuries constitute a domestic injury. But with respect to the particular type of property injury alleged here—the misappropriation of Bascuñán's trust funds from a specific bank account located in the United States—we conclude that the location of the property and not the residency of the plaintiff is the dispositive factor.

### 2. The BCI Share Theft

In light of the foregoing, the question presented with respect to the BCI Share Theft is whether the misappropriation of the bearer shares, located in a safety deposit box in New York, also constitutes the misappropriation of *tangible* property. We conclude it does.

Importantly, Bascuñán does not allege that Elsaca's RICO activity caused a drop in the economic value of these shares.[77] He contends instead that these shares were, in effect, stolen—*physically* stolen—from a safety deposit box in New York. Bearer shares are a form of stock "that has no recorded ownership information."[78] As a result, "the physical bearer of the stock certificate is presumed to be the owner."[79] It is thus fair to say that, by fraudulently taking possession of the bearer shares (*i.e.*, by taking them from the New York safety deposit box), Elsaca defrauded Bascuñán out of his interest in BCI. At the motion to dismiss stage, that is enough to plausibly allege an injury to tangible property within the United States, and thus a "domestic injury" within the meaning of the civil RICO statute.

### CONCLUSION

To summarize, we hold:

(1) The fact that a defendant used bank accounts located within the United States to facilitate or conceal the theft of property located outside of the United States, on its own, does not establish that a civil RICO plaintiff has suffered a domestic injury;

(2) The misappropriation of tangible property located in the United States, on the other hand, causes a "domestic injury" for purposes of civil RICO, even if the owner of the property resides abroad. Bascuñán's alleged injuries involving the misappropriation of trust funds held in a bank account in

---

**75.** *See* Restatement (Second) of Conflicts of Laws §§ 6, 145.

**76.** *See id.* §§ 145, 147.

**77.** The bearer shares at issue did not represent Bascuñán's 1.47% ownership interest in BCI. Instead, the bearer shares that Elsaca allegedly stole represented one Estate entity's (Hofstra's) ownership over another Estate en-

tity (Tarascona). Tarascona, in turn, directly controlled the shares making up Bascuñán's stake in BCI.

**78.** Black's Law Dictionary 1642 (10th Ed. 2014).

**79.** *Id.*

New York, and the theft of bearer shares from a safety deposit box also located in New York, were domestic. The District Court thus erred in dismissing Bascuñán's Amended Complaint on the grounds that he alleged only foreign injuries;

(3) Because it was based on the same legal error, the District Court's order denying Bascuñán's motion for leave to file a second amended complaint must be vacated. In the event that Bascuñán seeks leave to file another amended complaint, the District Court should determine, in light of our ruling, whether any such amendment is futile.

For the reasons set out above, we **REVERSE** the District Court's order granting Elsaca's motion to dismiss, we **VACATE** the District Court's order denying Bascuñán's motion for leave to file a second amended complaint, and we **REMAND** the cause for further proceedings consistent with this opinion.